# EXHIBIT A

E-FILED; Montgomery Circuit Court
Docket: 12/28/2021 4:13 PM; Submission: 12/28/2021 4:13 PM

## IN THE CIRCUIT COURT FOR
## MONTGOMERY COUNTY, MARYLAND

| | |
|---|---|
| WILLIAM KIRST AND CHRISTINA KIRST Derivatively on Behalf of Nominal Defendant NOVAVAX, INC., North Port, FL 34286 | Case No.: |
| Plaintiffs, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| STANLEY C. ERCK 21 Firstfield Road Gaithersburg, MD 20878 | **JURY TRIAL DEMANDED** |
| MARGARET G. MCGLYNN 21 Firstfield Road Gaithersburg, MD 20878 | |
| RACHEL KING 21 Firstfield Road Gaithersburg, MD 20878, | |
| GREGG ALTON 21 Firstfield Road Gaithersburg, MD 20878 | |
| JAMES F. YOUNG 21 Firstfield Road Gaithersburg, MD 20878 | |
| RICHARD DOUGLAS 21 Firstfield Road Gaithersburg, MD 20878 | |
| RAJIV I. MODI 21 Firstfield Road Gaithersburg, MD 20878 | |
| MICHAEL A. MCMANUS, JR. 21 Firstfield Road Gaithersburg, MD 20878 | |

#5281019v.1

DAVID MOTT
21 Firstfield Road
Gaithersburg, MD 20878

GREGORY F. COVINO
21 Firstfield Road
Gaithersburg, MD 20878

JOHN J. TRIZZINO
21 Firstfield Road
Gaithersburg, MD 20878

        Defendants,

        And,

NOVAVAX, INC.
21 Firstfield Road
Gaithersburg, MD 20878

SERVE ON RESIDENT AGENT:
The Corporation Trust Incorporated
2405 York Road, Suite 201
Lutherville Timonium, MD 21093-2264

        Nominal Defendant.

Plaintiffs William Kirst and Christina Kirst ("Plaintiffs"), by and through their undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Novavax, Inc. ("Novavax" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and violations of federal law. Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Novavax with the U.S. Securities and Exchange Commission

2

("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's directors and officers in their management and control of the Company from March 2, 2021 to the present ("Relevant Period").

2.     Novavax is a biotechnology company that focuses on the discovery, development, and commercialization of vaccines to prevent serious infectious diseases and address health needs. The Company's product candidates include, among others, NVX-CoV2373, which is in development as a vaccine for COVID-19.  Prior to the start of the Relevant Period, the Company announced that it planned to complete Emergency Use Authorization ("EUA") submissions for NVX-CoV2373 with the U.S. Food and Drug Administration ("FDA") in the second quarter of 2021.

3.     As more fully discussed below, Defendants caused the Company to make materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Company made false and/or misleading statements and/or failed to disclose that: (i) the Company overstated its manufacturing capabilities and downplayed manufacturing issues that would impact its approval timeline for NVX-CoV2373; (ii) as a result, the Company was unlikely to meet its anticipated EUA regulatory timelines for NVX-CoV2373; (iii) accordingly, the Company overstated the regulatory and commercial prospects for NVX-CoV2373; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.     On May 10, 2021, *The Washington Post* reported that the Company's EUA "filing

3

was delayed by manufacturing regulatory issues, until June at the earliest, according to four people who had recently been briefed on the [C]ompany's plans." Later that day, on a call that the Company hosted with investors and analysts to discuss the Company's first quarter 2021 financial and operational results (the "1Q21 Investor Call"), the Company confirmed that it was unlikely to seek an EUA for NVX-CoV2373 in the U.S. until July 2021 at the earliest— *i.e.*, the third quarter of 2021.

5.     Following publication of *The Washington Post* article, the Company's stock price fell $15.50 per share, or 8.81%, to close at $160.50 per share on May 10, 2021.   Moreover, following the Company's 1Q21 Investor Call, the Company's stock price continued to fall an additional $22.32 per share, or 13.91%, to close at $138.18 per share on May 11, 2021.

6.     On August 5, 2021, the Company issued a press release reporting its financial results and operational highlights for the second quarter of 2021.   Among other news, the Company reported that it expected to file for NVX-CoV2373's EUA in the fourth quarter of 2021, rather than the third quarter of 2021.

7.     On this news, the Company's stock price fell $46.31 per share, or 19.61%, to close at $189.89 per share on August 6, 2021.

8.     Finally, on October 19, 2021, *Politico* published an article entitled "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign."   The *Politico* article reported that the Company "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373.   The *Politico* article cited anonymous sources as stating that the Company's "issues are more concerning than previously understood" and that the Company could take until the end of 2022 to resolve its manufacturing issues and win regulatory authorizations and approvals.

4

9.     On this news, the Company's stock price fell $23.69 per share, or 14.76%, to close at $136.86 per share on October 20, 2021.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the claims asserted herein because the amount in controversy exceeds the sum of $25,000, exclusive of interest and costs.

11.     Venue is proper in this Court because the Company maintains its principal place of business within Montgomery County, a substantial portion of the transactions and wrongs complained of herein occurred in Montgomery County, and Defendants have received substantial compensation in Montgomery County by doing business here and engaging in numerous activities that had an effect in Montgomery County.

## PARTIES

**Plaintiffs**

12.     Plaintiffs purchased shares of Novavax stock during the Relevant Period and continue to hold their Novavax stock currently.

**Nominal Defendant**

13.     Nominal Defendant Novavax is a Delaware corporation with principal executive offices located at 21 Firstfield Road, Gaithersburg, Maryland 20878.

**Director Defendants**

14.     ***Defendant Stanley C. Erck*** ("Erck") has served as the President and Chief Executive Officer ("CEO") of the Company since April 2011.  Defendant Erck has served as a Company director since June 2009 and has served as its Executive Chairman of the Board beginning in February 2010.

15.     ***Defendant Margaret G. McGlynn*** ("McGlynn") has served on the Board since 2020.

5

16. *Defendant Rachel King* ("King") has served on the Board since 2018.

17. *Defendant Gregg Alton* ("Alton") has served on the Board since November 2020.

18. *Defendant James F. Young* ("Young") has served on the Board since April 2010 and was appointed Chairman in April 2011.

19. *Defendant Richard Douglas* ("Douglas") has served on the Novavax Board since 2010.

20. *Defendant Rajiv I. Modi* ("Modi") has served on the Board since 2009.

21. *Defendant Michael A. McManus, Jr.* ("McManus") has served on the Board since 1998.

22. *Defendant David Mott* ("Mott") has served on the Board since 2009. Defendant Mott is currently a private investor through Mott Family Capital and Defendant Mott was given approximately 65,000 shares of Company common stock prior to his appointment to the Board. On September 23, 2021, while the Company's securities traded at artificially inflated prices, Defendant Mott personally profited by selling 24,961 shares of common stock at a weighted average price of $253 per share, on the basis of adverse, material nonpublic information about the Company thereby pocketing about $6.3 million in illegal insider trading proceeds. At the time Defendant Mott made his sale, it was the biggest sale of Novavax shares made by an insider individual in the last twelve months.

23. Defendants Erck, McGlynn, King, Alton, Young, Douglas, Modi, McManus and Mott are herein referred to as the "Director Defendants." Because of their positions with the Company, they possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Director Defendants were provided

6

with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Director Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Director Defendants are liable for the false statements pleaded herein.

**Officer Defendants**

24.     ***Defendant Gregory F. Covino*** ("Covino") served as the Company's Chief Financial Officer ("CFO") and Executive Vice President ("EVP") from November 2020 until April 2021 when he stepped down for "personal reasons."

25.     ***Defendant John J. Trizzino*** ("Trizzino") served as the Company's Interim CFO from April 12, 2021 to August 16, 2021. Defendant Trizzino also serves as the Company's Chief Commercial Officer, Chief Business Officer, and an EVP.

26.     The Director Defendants and Defendants Covino and Trizzino are collectively referred to herein as "Individual Defendants".

**THE AUDIT COMMITTEE CHARTER**

27.     The Audit Committee's responsibilities are to assist the Board in in fulfilling its responsibilities for oversight. The Company's Audit Committee Charter states in relevant part:

> the Company's accounting and financial reporting processes; the preparation, presentation and integrity of the financial reports and other financial information provided by the Company to any government or regulatory body, the public or other users thereof; the adequacy and efficacy of the Company's systems of internal accounting, auditing and financial controls, the Company's compliance with legal and regulatory requirements; the conduct, independence and qualifications of the Company's independent auditor; the performance of the annual independent audit of the Company's financial statements; the Company's

7

compliance with applicable federal and state laws and regulations; and the implementation and operation of the Company's corporate compliance program (the "Compliance Program").

28.     The Audit Committee Charter further states:

*Financial Statements and Disclosures*

•       The Committee shall review with management and the independent auditor the audited financial statements to be included in the Company's Annual Report on Form 10-K (or the Annual Report to Stockholders if distributed prior to the filing of the Form 10-K) and the report thereon, and including any disclosures with respect thereto in Management's Discussion and Analysis, and review and consider with the independent auditor the matters required to be discussed by PCAOB Auditing Standard No. 1301, Communications with Audit Committees, and any other applicable requirements of the PCAOB. Such review shall take place prior to the publication of the annual audited financial statements, and the Committee shall make its recommendation to the Board with respect to their inclusion in the Company's Annual Report on Form 10-K or Annual Report to Stockholders, as appropriate.

•       As a whole, or between meetings through the Committee Chair, the Committee shall review with the independent auditor the Company's interim financial results to be included in the Company's quarterly reports to be filed with the SEC, and including any disclosures with respect thereto in Management's Discussion and Analysis, and the matters required to be discussed by applicable requirements of the PCAOB. Such review will occur prior to the Company's publication of the interim financial results.

•       The Committee, as a whole, or between meetings through the Committee Chair, shall review with management and the independent auditor the Company's earnings press releases, including the type of information to be included and its presentation, and the use of any pro forma, adjusted or other non-GAAP financial information, prior to their release to the public.

•       The Committee shall discuss with management and the independent auditor any significant issues regarding the accounting principles, practices and judgments made in connection with the preparation of the Company's financial statements. In this regard, the Committee shall obtain and review a report from the independent auditor regarding all critical accounting policies and practices to be used in the Company's financial statements and any major changes thereto, all alternative treatments of financial information within GAAP that have been discussed with management, the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor, and other material written communications between the independent auditor and management.

8

- The Committee shall review the Company's disclosure controls and procedures, and management's assessment thereof.

- As necessary, the Committee shall review with the independent auditor and management:

  - significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements;
  - the clarity of the financial disclosures made by the Company;
  - potential changes in GAAP and other regulatory and accounting initiatives, and their effects on the Company's financial statements; and
  - the effect of any off-balance sheet structures and aggregate contractual obligation on the Company's financial statements.

*Internal Controls*

- The Committee shall review and discuss with management, internal audit staff (or other personnel responsible for the internal audit function) and the independent auditor the quality, adequacy and effectiveness of the Company's accounting, financial and other internal controls and procedures, and elicit recommendations for both the improvement of existing controls and adoption of new controls, including any special steps or remedial measures adopted in light of material control weaknesses or significant deficiencies and, to the extent applicable, the Company's internal controls report and the independent auditor's internal controls report prior to the filing of any Annual Report on Form 10-K required to be filed by the Company with the SEC.

- The Committee shall obtain from management and the independent auditor and review the disclosures made in connection with the certification process regarding the effectiveness of the Company's internal control structure and procedures for financial reporting, including (i) all significant deficiencies and material weaknesses in the design and operation of internal controls over financial reporting, (ii) any fraud (whether or not material) that involves management or other employees having a significant role in the Company's internal controls over financial reporting, (iii) all changes to internal controls over financial reporting, including corrective actions, since the last Annual Report on Form 10-K or Quarterly Report on Form 10-Q, as applicable, and (iv) to the extent applicable, any disclosures made during the certification process for the Annual Report on Form 10-K and any Quarterly Report on Form 10-Q.

*Internal Audit Oversight*

- With respect to the Company's internal audit function, the Committee shall:

9

- review and discuss with the principal internal auditor of the Company regular reports from the principal internal auditor to the Committee on the scope and the results of the work performed by the internal audit function;
- review the significant reports to management prepared by the internal audit function and management's responses;
- at least annually review and discuss with the principal internal auditor of the Company and management the annual internal audit plan and the adequacy of internal audit resources (including with respect to budget and staffing), the performance and effectiveness of the internal audit function, and any recommended changes in the planned scope of the internal audit; and
- review and concur in the appointment, and dismissal and replacement when appropriate, of the principal internal auditor, and the compensation of the principal internal auditor.

*Compliance Oversight and Reporting*

• The Committee shall oversee the establishment of procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, the confidential and anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters, and the operation of a whistleblower's communication system allowing employees, officers, directors and the general public to make reports about potential legal and compliance violations, including anonymous reports where permitted by law.

• The Committee shall review with the Company's Chief Legal Officer and/or outside counsel legal matters that may have material impact on the financial statements, the Company's compliance with legal and regulatory requirements, and material violations of the Company's Code of Business Conduct and Ethics, as well as any material reports or inquiries received from, or correspondence with, regulators or governmental agencies.

• The Committee shall ensure that the Company maintains a written Code of Business Conduct and Ethics and other policies and procedures that effectively address the Company's compliance obligations, avoidance of conflicts of interest, and other related matters. The Committee, in consultation with the Chief Compliance Officer or other Compliance Program officials, shall recommend to the Board any changes to the Code of Business Conduct and Ethics deemed necessary or appropriate by the Committee.

• The Committee shall review and discuss with the Chief Legal Officer and Chief Compliance Officer an annual plan for the Company's Compliance Program and monitor such plan's progress and results during the year through regular reports from the Chief Legal Officer and Chief Compliance Officer to the Committee on the Company's Compliance Program.

10

- The Committee shall ensure that the Company, led by the Compliance Program, promptly responds to detected instances of non-compliance and takes appropriate corrective actions, including, where appropriate, employee discipline, the adoption of preventative measures, and reporting of non-compliance to relevant government authorities.

*Risk Assessment and Risk Management*

- The Committee shall periodically (but no less than annually) review and discuss guidelines and policies by which the Company undertakes risk assessment and risk management and discuss with management the Company's major financial risk exposures and the steps taken or to be taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

- The Committee shall oversee the establishment of an Enterprise Risk Management ("ERM") system by the Legal Department and the Compliance Program and at least annually, receive and review the findings of the Legal Department's annual ERM review.

## FALSE AND MISLEADING STATEMENTS

29.     On March 1, 2021, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K stated: "We . . . plan to file submissions for [EUA] with the FDA and expect to complete our EUA filing in the second quarter of 2021."

30.     The 2020 10-K also stated that "[w]ith respect to the global manufacturing and supply of NVX-CoV2373, we have secured manufacturing for our antigen component and Matrix-M adjuvant, as well as secured fill/finish activities for NVX-CoV2373 at several sites globally"; that "[t]hrough our various manufacturing partnerships, we expect our projected global manufacturing production rate of NVX-CoV2373 to be over two billion doses annually when we are at full capacity, which we expect to occur in mid-2021"; and that "[t]hese additional partnerships will further increase our production capacity and are expected to support a rapid roll-out of NVX-CoV2373 globally."

11

31.     In addition, the 2020 10-K stated that "we anticipate bringing our NVXCoV2373 vaccine candidate to market following global regulatory approvals which, if achieved, should significantly impact revenue"; that, "[i]n anticipation, we have entered into various APAs [advance purchase agreements] with government customers that are expected to result in the delivery of approximately 200 million doses of NVX-CoV2373 throughout 2021 and into the first half of 2022"; and that "[w]e also entered into multiple supply and license agreements with strategic partners to supply NVX-CoV2373 in their specified territories under which we are entitled to receive royalty revenue from the sale of NVX-CoV2373 by such partners."

32.     Appended as exhibits to the 2020 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Erck and Covino certified that "[t]he [2020 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended[,]" and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company for the dates and periods covered by the [2020 10-K]."

33.     On March 2, 2021, the Company issued a press release, announcing its fourth quarter and full year 2020 financial results and operational highlights (the "03/02/2021 Press Release"). That press release stated, in relevant part, that the Company "[e]ngaged in ongoing dialogue with [the FDA] . . . with potential for EUA filing in the second quarter of 2021"; that the Company "[i]ncreased projected global manufacturing capacity to over 2 billion annualized doses when at full-capacity, expected to occur in mid-2021[,]" with "[a]pproximately one billion doses to be manufactured by Serum Institute of India Private Limited (SIIPL)"; that the Company "[c]ompleted collaborations for global manufacturing, commercialization and

distribution of NVX-CoV2373"; and that the Company "[s]ecured agreements for approximately 200 million doses of NVX-CoV2373[.]"

34.    The 03/02/2021 Press Release also quoted Defendant Erck, who stated that "Novavax continues to make significant strides towards bringing NVX-CoV2373 . . . to market"; that "[w]e believe [NVX-CoV2373's] attributes support [EUA] and have initiated dialogue with regulators to pursue appropriate regulatory authorization"; that "we have secured agreements for the delivery of approximately 300 million doses of NVX-CoV2373"; that "we are proud to partner with the Serum Institute of India to jointly supply 1.1 billion doses of NVXCoV2373 to Gavi through the COVAX Facility"; and that "[w]e continue to work tirelessly to make final commercial preparations in advance of delivering our product across the globe."

35.    The statements referenced above were materially false and misleading because Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) the Company overstated its manufacturing capabilities and downplayed manufacturing issues that would impact its approval timeline for NVX-CoV2373; (ii) as a result, the Company was unlikely to meet its anticipated EUA regulatory timelines for NVX-CoV2373; (iii) accordingly, the Company overstated the regulatory and commercial prospects for NVX-CoV2373; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**THE TRUTH PARTIALLY EMERGES**

36.    On May 10, 2021, *The Washington Post* reported that the Company's EUA "filing was delayed by manufacturing regulatory issues, until June at the earliest, according to four people who had recently been briefed on the [C]ompany's plans." Specifically, *The Washington Post* reported that "[t]he delay is due in part to a regulatory manufacturing issue related to an

13

assay," according to the people briefed on the trial status, which "are tests used throughout the manufacturing process to check the contents and quality of vaccines."

37.    Later that day, on the Company's 1Q21 Investor Call, the Company confirmed that it was unlikely to seek EUA for NVX-CoV2373 in the U.S. until July 2021 at the earliest— *i.e.*, the third quarter of 2021.

38.    Following publication of *The Washington Post* article, the Company's stock price fell $15.50 per share, or 8.81%, to close at $160.50 per share on May 10, 2021. Moreover, following the Company's 1Q21 Investor Call, the Company's stock price continued to fall an additional $22.32 per share, or 13.91%, to close at $138.18 per share on May 11, 2021. Despite these declines in the Company's stock price, the Company's securities continued to trade at artificially inflated prices because of its continued misstatements and omissions regarding NVX-CoV2373's EUA regulatory timeline, as well as the Company's manufacturing capabilities and manufacturing issues that were likely to impact the approval timeline for NVX-CoV2373.

39.    For example, on May 10, 2021, the Company issued a press release reporting the Company's first quarter 2021 financial results and operational highlights (the "05/10/2021 Press Release"). That press release stated that the Company "[s]ecured additional manufacturing capacity for NVX-CoV2373 globally, with continued progress toward achieving full manufacturing capacity"; that the Company's "[a]nticipated capacity [is] revised to 100 million doses per month by the end of the third quarter of 2021, with remainder of capacity expected to come online in the fourth quarter to support 150 million doses per month"; that "[the Company is] to manufacture and distribute 350 million doses to participants of the COVAX Facility"; that the Company "[p]rogressed regulatory processes for authorization of NVX-CoV2373 with

multiple regulatory agencies globally"; and that the Company "[i]ntend[s] to file for authorization with the [FDA] . . . in the third quarter of 2021[.]"

40.     The 05/10/2021 Press Release also quoted Defendant Erck, who stated that "Novavax made great strides over the first quarter to pave the path for our COVID-19 vaccine candidate, NVX-CoV2373"; that, "[i]n parallel, we have secured additional manufacturing and supply agreements, expanding our global supply chain to over 10 countries"; that, "[i]n the coming months, we look forward to delivering on critical milestones, including [*inter alia*] . . . completing our regulatory submissions"; and that, "[a]s we continue our dialogue with regulatory authorities for authorization, we remain committed to promptly delivering our vaccine globally, ensuring equitable access and expansive distribution."

41.     That same day, the Company also filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for the quarter ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q stated that "[a]s of May 2021, we continue to work to complete various CMC [chemistry, manufacturing, and controls] requirements, which ensure that our manufacturing processes are in accordance with regulatory standards"; and that "[w]e plan to file submissions for [EUA] with the FDA and aim to complete our EUA filing [for NVX-CoV2373] in the third quarter of 2021."

42.     With respect to the Company's manufacturing capabilities for NVX-CoV2373, the 1Q21 10-Q stated that "[w]e have established a global manufacturing and supply chain to support the commercialization of NVX-CoV2373"; that "[w]ith significant progress made throughout 2020 and through the first quarter of 2021, our global supply chain now spans over 10 countries and includes Novavax owned facilities in the Czech Republic and Sweden, as well as partnerships with contract manufacturing organizations around the world"; that "[i]n the first

15

quarter of 2021, we took additional steps to expand our global supply chain and ready our company for commercialization[,]" which "included securing additional manufacturing capacity for NVX-CoV2373, as well as furthering existing collaborations with manufacturing partners globally"; and that "[i]n the quarter, we also continued to advance CMC activities[,]" including "ongoing analytical testing and product characterization, as well as the qualification and validation of assays needed to demonstrate process consistency across our network of manufacturing facilities."

43.      The 1Q21 10-Q further assured the market that "we expect our global manufacturing capacity of NVX-CoV2373 to be approximately 100 million doses per month by the end of the third quarter of 2021"; that "[w]e anticipate the remainder of our manufacturing capacity will come online in the fourth quarter of 2021, which we expect will support total global manufacturing capacity of approximately 150 million doses per month"; that "[i]n April 2021, our Base Agreement and a Project Agreement (together, the 'OWS Agreement') . . . was amended to fully fund the agreement up to $1.75 billion to support certain activities related to the development of NVX-CoV2373[,]" including "the manufacture and delivery of 100 million doses of NVX-CoV2373 to the U.S. government"; and that "[w]e expect this funding will assist in rapidly developing our large-scale manufacturing capacity and transitioning into ongoing production, including the capability to stockpile and distribute large quantities of NVX-CoV2373 for use in clinical trials and potentially for commercial sale, if authorized for emergency use or licensed."

44.      Appended as exhibits to the 1Q21 10-Q were substantively the same SOX certifications as referenced above, signed by Defendants Erck and Trizzino.

45.     The statements referenced above were materially false and misleading because the Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) Novavax overstated its manufacturing capabilities and downplayed manufacturing issues that would impact its approval timeline for NVX-CoV2373; (ii) as a result, the Company was unlikely to meet its anticipated EUA regulatory timelines for NVX-CoV2373; (iii) accordingly, the Company overstated the regulatory and commercial prospects for NVX-CoV2373; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

46.     On August 5, 2021, the Company issued a press release reporting its second quarter 2021 financial results and operational highlights (the "08/05/2021 Press Release"). Among other news, the Company reported that it "[e]xpect[s] to submit for [EUA] to the [FDA for NVX-CoV2373] in the fourth quarter of 2021[,]" rather than the third quarter of 2021.

47.     On this news, the Company's stock price fell $46.31 per share, or 19.61%, to close at $189.89 per share on August 6, 2021. Despite this decline in the Company's stock price, the Company' securities continued to trade at artificially inflated prices because of the continued misstatements and omissions regarding NVXCoV2373's EUA regulatory timeline, as well as the Company's manufacturing capabilities and manufacturing issues that were likely to affect the approval timeline for NVX-CoV2373.

48.     For example, the 08/05/2021 Press Release stated that the Company "[c]ollaborated with partners globally to progress toward anticipated manufacturing capacity" and that the Company is "[o]n track to achieve capacity of 100 million doses per month by the end of the third quarter of 2021 and 150 million doses per month by the end of the fourth quarter 2021[.]"

17

49.     The 08/05/2021 Press Release also quoted Defendant Erck, who stated that "[w]e are highly encouraged by the filing of regulatory submissions in multiple markets, made in partnership with Serum Institute of India[,]" and that "[w]e view these submissions as the first of many filings to come, which will allow NVX-CoV2373 to be made available at a global scale[.]"

50.     On August 5, 2021, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2021 (the "2Q21 10-Q"). The 2Q21 10-Q stated that "[a]s of August 2021, we continue to work to complete various Chemistry, Manufacturing and Controls ('CMC') requirements, which ensure that our manufacturing processes are in accordance with regulatory standards"; that "[f]unding under the OWS Agreement is expected to support our plans to file submissions for EUA and licensure with the FDA"; that "[t]he U.S. government has recently instructed us to prioritize alignment with the FDA on our analytic methods before conducting additional U.S. manufacturing"; and that "[t]he U.S. government also instructed us to proceed with work under the OWS Agreement related to all other activities including *[inter alia]* . . . regulatory interactions, analytics/assays and characterization of manufactured vaccine and project management."

51.     With respect to the Company's manufacturing capabilities for NVX-CoV2373, the 2Q20 10-Q stated that "[w]e have established a global manufacturing and supply chain to support the commercialization of NVX-CoV2373"; that "[w]ith significant progress made throughout 2020 and through the second quarter of 2021, our global supply chain spans over ten countries and includes Novavax-owned facilities in the Czech Republic and Sweden, as well as partnerships with contract manufacturing organizations around the world"; that, "[i]n the second quarter of 2021, we remained focused on readying our global supply chain for commercialization

18

in order to ensure we promptly deliver NXV-CoV2373 upon anticipated regulatory authorizations"; that "[w]e expect our global manufacturing capacity of NVXCoV2373 to be approximately 100 million doses per month by the end of the third quarter of 2021"; and that "[w]e anticipate the remainder of our manufacturing capacity will be ready by the end of the fourth quarter of 2021, which we expect will support total global manufacturing capacity of approximately 150 million doses per month."

52.     Appended as exhibits to the 2Q21 10-Q were substantively the same SOX certifications as referenced above, signed by Defendants Erck and Trizzino.

53.     The statements referenced above were materially false and misleading because the Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) the Company overstated its manufacturing capabilities and downplayed manufacturing issues that would impact its approval timeline for NVX-CoV2373; (ii) as a result, the Company was unlikely to meet its anticipated EUA regulatory timelines for NVX-CoV2373; (iii) accordingly, the Company overstated the regulatory and commercial prospects for NVX-CoV2373; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### THE TRUTH FULLY EMERGES

54.     On October 19, 2021, *Politico* published an article entitled "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign."   The *Politico* article reported that the Company "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373.  The *Politico* article also cited anonymous sources as stating that the Company's "issues are more concerning than

19

previously understood" and that the Company could take until the end of 2022 to resolve its manufacturing issues and win regulatory authorizations and approvals.

55.     Specifically, the *Politico* article reported that the Company's "delay, which was confirmed by three other people familiar with the discussions between Maryland-based Novavax and the Biden administration, represents a major setback in the effort to vaccinate the world in the wake of new, more transmissible variants." For example, according to the *Politico* article, the Company "has consistently run into production problems[,]" including "[t]he methods it used to test the purity of the vaccine[,]" which "have fallen short of regulators' standards" as the Company "has not been able to prove that it can produce a shot that is consistently up to snuff, according to multiple people familiar with Novavax's difficulties."

56.     The *Politico* article also reported that "[a]lthough Novavax recently attested to some of its analytics and testing issues in a quarterly filing with the [SEC], the [C]ompany's issues are more concerning than previously understood, according to two of the people with direct knowledge of the matter." For example, while "it is generally understood that each [COVID-19] vaccine batch should reach at least 90 percent" in terms of purity levels, the Company "has struggled to attain anywhere close to that, one of the people with direct knowledge of the situation said[,]" and, according to "[a]nother person familiar with the [C]ompany's manufacturing process[,]" the Company "has recently shown purity levels hovering around 70 percent."

57.     Moreover, the *Politico* article revealed that Novavax's manufacturing issues were so severe that they strained global COVID-19 vaccination efforts. For example, with respect to the COVID-19 Vaccines Global Access initiative, also known as COVAX, the *Politico* article found that "[t]he global coalition is already behind on hundreds of millions of planned doses this

month" and "is now also at risk of missing its already downgraded 2021 target." The *Politico* article also quoted the director of the Duke Global Health Innovation Center, who stated: "COVAX continues to be challenged for adequate supply . . . in that context, Novavax's manufacturing challenges and delays have been massively disruptive[.]"

58.    The *Politico* article also found that the Company was already aware of specific concerns with NVX-CoV2373's manufacturing process, stating that "senior Trump administration officials on Operation Warp Speed . . . repeatedly warned the [C]ompany that it risked running into problems in scaling up manufacturing of the shot, two people with direct knowledge of those discussions said"; that, "[i]n particular, they worried that Novavax would have difficulty ensuring that the vaccine consistently met the FDA's rigorous quality standards once the vaccine went into mass production — the exact problem that has now stymied the company for months"; and that Novavax "rushed the process" and "can't make" the vaccine, according to one of the people with knowledge of the matter.

59.    Finally, the *Politico* article revealed that, even as Defendants repeatedly downplayed NVX-CoV2373's manufacturing issues, the U.S. government's confidence in the Company's ability to successfully manufacture the drug had waned.  For example, the *Politico* article stated, inter alia:

> U.S. officials working with the [C]ompany are not as confident [as Novavax is in its manufacturing capabilities], according to three people with knowledge of the matter. Novavax's manufacturing problems are seen as far more difficult to fix than the sanitary and design concerns that halted production of J&J's vaccine at the Emergent plant earlier this year, those people said.
>
> And even as the [C]ompany begins to seek regulatory approval in other countries, there remains doubt in the U.S. that it has solved the fundamental vaccine purity flaws that the people with knowledge said have affected its ability to make doses at plants around the world.

Several vaccine batches have already been discarded, and four people with knowledge of the matter say U.S. officials now no longer expect the [C]ompany to win FDA sign-off on the vaccine until next year at the earliest.

"At some level, I think the efficacy was never going to outweigh the risk associated with the impurity that was in there," said one of the people with knowledge of the matter. "I'm not surprised this is where we are."

60.     On this news, the Company's stock price fell $23.69 per share, or 14.76%, to close at $136.86 per share on October 20, 2021.

## DUTIES OF THE DIRECTOR DEFENDANTS

61.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

62.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

63.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and

22

controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)        ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)        conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)        properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)        remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)        ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)        ensure that all decisions were the product of independent business

23

judgment and not the result of outside influences or entrenchment motives.

64.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

65.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

66.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

67.     Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

68.     During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Erck, McGlynn, King, Alton, Young, Douglas, Modi,

24

McManus and Mott.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

69.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

70.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

71.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

72.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

73.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

### *Defendant Mott*

74.     Defendant Mott personally benefited from the Individual Defendants' false and misleading statements by having the opportunity to sell shares of Novavax stock at artificially inflated prices, a benefit not shared by the rest of Novavax stockholders.

### Defendant Erck

75.     Because of his CEO and President position with the Company, Defendant Erck is not independent.

76.     The Company provides Defendant Erck with his principal occupation, and he received handsome compensation for his services.   Defendant Erck's compensation in this position, he received $48,086,018 and $2,438,562 for years 2020 and 2019, respectively.   These amounts are material to Defendant Erck.

77.     Defendant Erck was responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on.

78.     Defendant Erck is also a Defendant in the securities class action entitled *Sothinathan Sinnathurai v. Novavax, Inc., et al.*, Case No.: 8:21-cv-02910-TDC (D. Md.) (the "Securities Class Action") and faces a substantial likelihood of liability; therefore, demand on Defendant Erck is futile.

### Defendants Alton, Douglas and McManus

79.     Defendants Alton, Douglas, and McManus served as members of the Audit Committee during the Relevant Period.   Pursuant to the Audit Committee Charter, the Audit Committee Defendants were responsible for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management and legal and regulatory compliance that may affect the Company's financial reporting.   Defendants

26

Alton, Douglas, and McManus failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter and to issue false and misleading financial statements with the SEC. Thus, Defendants Alton, Douglas, and McManus breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendant Modi**

80.     Defendant Modi lacks independence because of his personal involvement with the Company. Defendant Modi is the managing director of Cadila Pharmaceuticals, Ltd. ("Cadila"). Novavax and Cadila have formed a joint venture called CPL Biologicals Private Limited, of which Novavax owns 20% and Cadila owns the remaining 80%. As of April 19, 2021, a subsidiary of Cadila owns 125,000 shares of the Company's outstanding common stock.

**COUNT I**

**(Against Defendant Mott for Insider Selling and Misappropriation of Information)**

81.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

82.     At the time of his stock sales set forth herein, defendant Mott knew of the information described above, and sold Novavax common stock on the basis of such information.

83.     The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which Mott used for his own benefit when he sold Novavax common stock.

84.     Defendant Mott's sales of Company common stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

27

85.   Since the use of the Company's proprietary information for their own gain constitutes a breach of defendant Mott's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits defendant Mott obtained thereby.

## COUNT II

### (Against The Director Defendants For Breach Of Fiduciary Duty)

86.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

87.   The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

88.   The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

89.   The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other public disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

90.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

91.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuit, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### (Against The Director Defendants For Waste Of Corporate Assets)

92.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

93.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

94.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

95.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

96.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

29

## COUNT IV

### (Against the Individual Defendants for Unjust Enrichment)

97.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

98.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, Novavax.

99.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Novavax that was tied to the performance or artificially inflated valuation of Novavax, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes compensation received under the 2015 Stock Plan, which certain Individual Defendants induced the Company's shareholders to amend and restate through false and misleading representations.

100.    Plaintiffs, as shareholders and representatives of Novavax, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

101.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT V

### (Against the Individual Defendants for Abuse Control)

102.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

103.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Novavax, for which they are legally responsible.

104.    As a direct and proximate result of the Individual Defendants' abuse of control, Novavax has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT VI

### (Against the Individual Defendants for Gross Mismanagement)

105.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

106.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Novavax in a manner consistent with the operations of the publicly-held corporation.

107.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Novavax has sustained and will continue to sustain significant damages.

108.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

109.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT VII

### (Against the Individual Defendants for Waste of Corporate Assets)

31

110.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

111.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

112.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Novavax to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

113.    As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

114.    Plaintiffs, on behalf of the Company, have has no adequate remedy at law.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's

#5281019v.1

supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated: December 28, 2021

/s/ Jaime W. Luse
John B. Isbister, CPF # 7712010177
Jaime W. Luse, CPF #0212190011
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700 – telephone
(410) 727-5460 – facsimile
jisbister@tydings.com
jluse@tydings.com

**Of Counsel (Pro had motions will be filed):**
**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiffs***

33